**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
***Southern Division***

| | | |
|---|---|---|
| **W.C. AND A.N. MILLER DEVELOPMENT COMPANY,** | * | |
| | * | |
| **Plaintiff,** | | |
| **v.** | * | **Case No.: GJH-14-00425** |
| **CONTINENTAL CASUALTY CCOMPANY,** | * | |
| | * | |
| **Defendant.** | | |
| | * | |

* * * * * * * * * * * * *

**MEMORANDUM OPINION**

This is a breach of contract action brought by Plaintiff W.C. and A.N. Miller Development Co. ("Miller") against Continental Casualty Co. ("Continental") arising out of Continental's refusal to provide Miller with legal defense costs associated with the defense of a lawsuit that Miller claims Continental was required to pay as part of Miller's insurance policy (the "Policy") with Continental. Miller now seeks from Continental $750,000, plus interest for the costs associated with the defense of that action.

This Memorandum Opinion addresses Continental's Motion for Judgment on the Pleadings, ECF No. 22, as well as Miller's Motion for Summary Judgment, ECF No. 26. A hearing on this motion was held on October 7, 2014, during which both parties presented oral argument. As further explained below, Continental's Motion for Judgment on the Pleadings is GRANTED. Having granted Continental's motion, the Court will DENY Miller's Motion for Summary Judgment.

## I. BACKGROUND

### A. The 2006 Adversary Proceeding[1]

In 2002, Haymount Limited Partnership ("HLP") retained International Benefits Group ("IBG") to help HLP secure financing for a real estate development project in Haymount, Virginia (the "Haymount Project"). *See* ECF No. 12-2 at ¶ 19. In connection with that project, HLP and IBG entered into a contract pursuant to which IBG agreed to provide HLP with introductions to various commercial lenders who might be willing to provide financing for the Haymount Project. *Id.* at ¶ 24. The contract stated that if HLP obtained a loan from a lender introduced to it by IBG, HLP would pay IBG a $3 million finder's fee. *Id.* Eventually, IBG introduced HLP to a financing company. *Id.* at ¶ 30. In turn, that financing company introduced HLP to yet another financier who ultimately provided HLP with financing for the Haymount Project. *Id*. at ¶ 37. Believing that it was entitled to the $3 million finder's fee for its role in facilitating the introduction of HLP to its lender, IBG requested its fee. *Id.* at ¶¶ 53-54, 60-61. That request was denied and IBG was never paid by HLP; instead, HLP paid a smaller commission to the intermediary company that was responsible for introducing HLP to its ultimate financier. *Id.* In reaching its decision not to pay IBG the finder's fee, IBG contends that HLP conspired with other actors to interfere with IBG's rights under the contract and to avoid payment of the finder's fee to IBG. *Id*. at ¶¶ 53-56, 60-61, 67-68, 79-87. As a result of HLP's

[1] The facts relating to the 2006 Adversary Proceeding are drawn from Exhibit B to Continental's Answer/Counterclaim. Exhibit B is a 2006 adversary complaint filed in a bankruptcy proceeding in the United States Bankruptcy Court for the District of New Jersey. *See* ECF No. 12-2. The Court takes judicial notice of the adversary complaint without converting Continental's Motion for Judgment on the Pleadings into a motion for summary judgment. *See Sec'y of State for Defense v. Trimble Navigation, Ltd*., 484 F.3d 700, 705 (4th Cir. 2007) (noting that a court may "take judicial notice of matters of public record" without converting a motion under Fed.R.Civ.P. 12(b)(6) to a motion under Fed.R.Civ.P. 56).

alleged breach of contract and its (and others') alleged tortious conduct, IBG claims it was forced into Chapter 11 bankruptcy. *Id*. at ¶¶ 57, 62-63.

During IBG's bankruptcy proceeding, IBG's Bankruptcy Trustee (the "Trustee") commenced an adversary proceeding in the United States Bankruptcy Court for the District of New Jersey ("2006 Adversary Proceeding"), naming as defendants, among others: HLP; the two general partners of HLP – Westminster and Haymount; Edward J. Miller, Jr., president of Haymount and chairman of Miller; and John A. Clark, vice president of Westminster and president of The John A. Clark Company. *See* ECF No. 12 at ¶ 15; *see also* ECF No. 12-2 at ¶¶ 11-17. The adversary complaint sought damages associated with the alleged conspiracy to deny IBG its finder's fee. The complaint included causes of action for breach of contract (*id.* at ¶¶ 66-70), *quantum meruit*/unjust enrichment (*id.* at ¶¶ 71-76), tortious interference (*id.* at ¶¶ 77-83), and common law and statutory conspiracy (*id.* at ¶¶ 84-92). Ultimately, on January 8, 2010, judgment was entered in favor of the Trustee against HLP and others in the amount of $4,469,158.00.

**B. The 2010 Lawsuit**[2]

On October 29, 2010, the same Trustee initiated a second action in the United States District Court for the District of New Jersey naming as defendants several of the same parties named in the 2006 Adversary Proceeding, including HLP, Edward J. Miller Jr., and John A. Clark ("2010 Lawsuit"). The very first paragraph of that complaint expressly characterized the suit as an "ancillary and adversary proceeding to recover and collect . . . $4,469,158 on a

[2] The facts relating to the 2010 Lawsuit are drawn from Exhibit C to Continental's Answer/Counterclaim. Exhibit C is a civil complaint filed in the United States District Court for the District of New Jersey. *See* ECF No. 12-3. Just as the Court did with the 2010 adversary complaint, the Court takes judicial notice of the 2010 complaint without converting Continental's Motion for Judgment on the Pleadings into a Motion for Summary Judgment. *See Sec'y of State for Defense*, 484 F.3d at 705.

judgment entered against [HLP]" and others in the 2006 Adversary Proceeding. *See* ECF No. 12-3 at ¶ 1. Then, for several pages, the complaint describes, in great detail, HLP's ownership structure (*id.* at ¶¶ 29-36), the Haymount Development (*id.* at ¶¶ 37-41), the process by which IBG obtained financing for HLP (*id.* at ¶¶ 42-47), and IBG's Chapter 11 Bankruptcy Proceeding, including the 2006 Adversary Complaint (*id.* at ¶¶ 57-88). The complaint goes on to describe a number of actions allegedly taken by the defendants that, according to the Trustee, were done to transfer HLP's assets in order to make them unavailable to satisfy the $4,469,158 judgment from the 2006 Adversary Proceeding. *Id.* at ¶¶ 134-80. Based on these allegations, the Trustee sued the defendants for various causes of action, including fraudulent transfer, fraudulent conveyance, common law and statutory conspiracy, creditor fraud, and aiding and abetting as the basis of claims for compensatory and punitive damages. *Id.* at ¶¶ 134-80.

### C. Tender of Defense to Continental

On November 10, 2010, Miller provided notice to Continental – its insurer – of the 2010 Lawsuit and informed Continental that it believed it was entitled to coverage under its Policy. *See* ECF No. 2 at ¶ 13. Despite Miller's demand, however, Continental advised Miller that it believed the Policy did not provide coverage for the 2010 Lawsuit. *See id*. at ¶ 14. According to Continental, Miller's Policy only provided coverage for those "Claims" first made during the Policy Period of November 1, 2010 to November 1, 2011. *See* ECF No. 12 at ¶ 34. Because, as Continental contends, the "Claim" serving as the basis for the 2010 Lawsuit was first made on March 17, 2006 (the date on which the 2006 Adversary Proceeding was commenced), prior to the inception of the Policy, the 2010 Lawsuit did not trigger coverage. *Id.* As such, Continental informed Miller that it would not provide a defense or defense costs to Miller or any of its

affiliated persons or entities named as defendants in the 2010 Lawsuit. *See* ECF No. 2 at ¶¶ 14-15.

**D. The Policy**

Miller purchased the Policy from Continental sometime in 2010. The Policy provided coverage for claims made between November 1, 2010 and November 1, 2011 (the "Policy Period"). *See* ECF No. 2-1 at 1. The Policy was written on a claims-made basis, meaning that it afforded coverage only for those "Claims" that were first made during the Policy Period. *See* ECF No. 22-1 at 1. The Policy included two types of coverages: Director & Officer ("D&O") Coverage and Entity Coverage. These coverages protected Miller for "Claims" made against the company, its subsidiaries, and its directors and officers. *See* ECF No. 2-1 at 3. Under these coverages, Continental was obligated to pay all loss, including litigation-defense costs, resulting from any "Claim" made during the Policy Period against the company, its subsidiaries, and its directors or officers for wrongful acts. *Id*. Furthermore, under the Policy, all "Interrelated Wrongful Acts" were considered one "Claim" for purposes of coverage. *Id.* at 9. Specifically, the Policy stated that "[m]ore than one Claim involving . . . Interrelated Wrongful Acts shall be considered one Claim which shall be deemed made on . . . the date on which the earliest such Claim was first made." *Id*. The Policy defined "Interrelated Wrongful Acts" as "any Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." *Id.* at 5.

**E. The Instant Lawsuit**

As a result of Continental's refusal to defend against the 2010 Lawsuit or otherwise provide coverage, Miller was forced to retain legal counsel and mount a defense on its own behalf and at its own expense. *See* ECF No. 2 at ¶ 16. Ultimately, Miller filed the instant lawsuit

against Continental claiming that Continental violated its insurance contract with Miller by refusing to provide coverage to reimburse Miller for costs associated with the defense of the 2010 Lawsuit. The crux of this action centers on whether the 2010 Lawsuit and the 2006 Adversary Proceeding are "Interrelated Wrongful Acts."

## II. STANDARD OF REVIEW

Continental moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF No. 12. Under Rule 12(c), a party may move for judgment on the pleadings any time after the pleadings are closed, as long as it is early enough not to delay trial. *See* Fed.R.Civ.P. 12(c). A Rule 12(c) motion is governed by the same standard as motions made pursuant to Rule 12(b)(6). *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009) (citation omitted).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint if it "fails to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). To that end, the Court bears in mind the requirements of Fed.R.Civ.P. 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678-79. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663.

## III. DISCUSSION

In this case, the Court is asked to decide, as a matter of law, whether the Continental Policy provided coverage for the 2010 Lawsuit, *i.e.*, was the 2010 Lawsuit an "Interrelated Wrongful Act" that was therefore not a "Claim" first made within the Policy Period. If the Court finds the 2010 Lawsuit was an "Interrelated Wrongful Act" and was not a "Clam" first made within within the Policy Period, then Continental properly denied Miller's request for coverage and Continental's Motion for Judgment on the Pleadings should be granted. For the reasons discussed below, the Court finds that the 2010 Lawsuit and the 2006 Adversary Proceeding are "Interrelated Wrongful Acts." As such, Continental's Motion for Judgment on the Pleadings is GRANTED.

"It is axiomatic that an insurance contract is interpreted like any other contract." *Rouse Co. v. Fed. Ins. Co.*, 991 F. Supp. 460, 465 (D. Md. 1998). "If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said and will not resort to extrinsic evidence to ascertain the contract's meaning." *Id.* Here, Miller does not argue that the Policy's definition of "Interrelated Wrongful Acts" (or any other definition or provision of the Policy) is ambiguous; instead, Miller argues that, for a variety of different reasons, the plain language of the Policy forbids the conclusion that the 2010 Lawsuit was an "Interrelated Wrongful Act."

First, Miller argues that because the 2006 Adversary Proceeding was "for breach of [a] written contract" it "falls outside the scope of Continental's coverage" and therefore cannot be treated with the 2010 Lawsuit as a single "Claim." ECF No. 23 at 7. In support of this position, Miller relies on the following language from the Policy:

III. EXCLUSIONS

1. Exclusions Applicable to All Loss

> [Continental] shall not be liable to pay any Loss under this Coverage Part in connection with any Claim made against [Miller]:
>
> *l.* for breach of any written or oral contract or agreement . . . .

Based on this language, Miller argues that "[b]y excluding coverage for breach-of-contract claims, Continental cannot claim that there was a 'wrongful act' in 2006 which can be brought forward into the 2010 Lawsuit analysis." *Id.* at 8. This argument incorrectly assumes that "Claims" must be covered under the Policy in order for them to be treated as a single "Claim." To the contrary, however, the Policy *does not* require a "Claim" to be covered for it to form the basis of an "Interrelated Wrongful Act" and, thus, to be treated as a single "Claim"; rather, to be treated as a single "Claim" all that is required is for the triggering events to be "Claims" and "Interrelated Wrongful Acts," as those terms are defined in the Policy. *See* ECF No. 2-1 at 9 (the Policy's single "Claim" provision: "More than one Claim involving . . . Interrelated Wrongful Acts shall be considered as one Claim").

Here, the Policy broadly defines a "Claim" as, among other things, "a civil . . . adjudicatory proceeding . . . against [Miller or its subsidiaries]" or "a written demand for monetary damages . . . against [Miller or its subsidiaries]." ECF No. 2-1 at 15. Under either of these broad definitions, the 2006 Adversary Proceeding constitutes a "Claim." Indeed, adversary proceedings arising under the Bankruptcy Code are considered civil proceedings. *See In re Banks*, 299 F.3d 296, 301 (4th Cir. 2002) (An adversary proceeding "is treated as a separate dispute between the Debtor and Creditor, subject to the procedural guidelines and safeguards contained in the Federal Rules of Civil Procedure.") (citing Fed.R.Bank.P. 7001); *see also In re*

*Dudley*, 502 B.R. 259, 270 (Bankr. W.D. Va. 2013) (recognizing that "[t]his adversary proceeding is a civil proceeding arising in a case filed under Title 11 of the United States Code"). Additionally, the adversary complaint filed in the 2006 Adversary Proceeding contains a written demand for monetary damages against Miller. *See* ECF No. 12-2 at 19-20.[3] Accordingly, despite Miller's conclusory statement that the 2006 Adversary Proceeding is not a "Claim" (*see* ECF No. 23 at 17), both it and the 2010 Lawsuit[4] are, in fact, "Claims" as that term is defined in the Policy. The "Claims" therefore must be treated as one "Claim" to the extent they involve "Interrelated Wrongful Acts." Thus, the issue becomes whether the 2006 Adversary Proceeding and the 2010 Lawsuit involve "Interrelated Wrongful Acts."

The Policy broadly defines "Interrelated Wrongful Acts" as "*any* wrongful acts which are logically or causally connected by reason or *any* common fact, circumstance, situation, transaction, or event." ECF No. 2-1 at 5 (emphases added). The parties disagree as to whether or not the 2010 Lawsuit and the 2006 Adversary Proceeding are "Interrelated Wrongful Acts."[5] Continental argues that the two actions are "Interrelated Wrongful Acts" because they both involved a "common scheme involving HLP and Mr. Miller to keep IBG from recovering any amount for its alleged services rendered in connection with the Haymount Project." ECF No. 22-1 at 14. According to Continental, the wrongful act at the core of the 2006 Adversary Proceeding

[3] Although the 2006 Adversary Proceeding does not name Miller as a defendant (like the 2010 Lawsuit does), HLP, a subsidiary of Miller, was named as a defendant. *See* ECF No. 22-1 at 3. Accordingly, a civil action brought against HLP would still be a "Claim" under the Policy. *See* ECF No. 2-1 at 23 (defining "Claim" as a "civil . . . proceeding . . . against [Miller] or any Subsidiary").

[4] Miller does not dispute that the 2010 Lawsuit, filed as a civil complaint in the United States District Court for the District of New Jersey, constitutes a "Claim."

[5] Miller concedes that the 2006 Adversary Proceeding and the 2010 Lawsuit are both "wrongful acts"; instead, Miller argues that the two actions should not be treated as a single "Claim" because they are not "interrelated." *See* ECF No. 23 at 16 (Miller's opposition arguing that "[t]he *wrongful acts* underlying the 2006 Lawsuit and the 2010 Lawsuit are not logically or causally connected.") (emphasis added).

was the alleged conspiracy involving HLP, Mr. Miller, and other defendants to secure financing for the Haymount Project without paying the $3 million finder's fee to IBG, which resulted in a $4,469,158 judgment against the defendants, including HLP and Mr. Miller. *Id.* Similarly, Continental contends that the wrongful act at the core of the 2010 Lawsuit was the allegedly fraudulent transfer of monies by HLP, Mr. Miller, and others to prevent the Trustee from recovering the amounts owed to IBG arising from the finder's fee and the contract between HLP and IBG, including the $4,469,158 judgment from in the 2006 Adversary Proceeding. *Id.* Thus, at its core, Continental argues that the two actions involve "a common scheme involving the same claimant, the same fee commission, the same contract and the same real estate transaction." ECF No. 22-1 at 14. Miller disagrees.

Specifically, Miller argues that what Continental has characterized as a "common scheme" is actually a "common motive," which is insufficient to establish the requisite interrelatedness. *See* ECF No. 23 at 12 (arguing that "[w]hat Continental has characterized as a 'common scheme' is at most an allegation that two disparate acts, involving different conduct committed by different people nearly four years apart, were done with the same *motive* of depriving IBG of its fee") (emphasis in original). In support of this argument, Miller relies extensively on *ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d. 789, 794 (D. Md. 2008). According to Miller, *ACE* "specifically addressed the interpretation and application of a provision [like] the one actually involved here" (*id.* at 8) and concluded that "a common purpose between disparate acts . . . does not establish interrelatedness." *Id.* at 12. *ACE*, however, is factually distinguishable.

In *ACE*, the insured was a company that operated telephone call centers for companies that sold "Debt Management Plans" to consumers. *Id.* at 799-800. The earlier of the "claims" at

issue was a putative class action filed against the insured by consumers who had enrolled in a specific Debt Management Plan. *Id.* The lawsuit claimed that the insured had engaged in "unfair, deceptive, and misleading debt management, credit counseling, budget planning and debt collection activities related to their sale of Debt Management Plans . . . ." *Id.* The later "claim" involved two separate government investigations that focused on the insured's marketing and credit counseling practices. *Id.* at 800. In reaching its conclusion that the two "claims" were not "Interrelated Wrongful Acts," the Court found that the two "claims" were based on challenges to the insured's general "business practices" and involved "occurrences different in scope and time." *Id.* The same cannot be said about this case.

Here, the 2006 Adversary Proceeding and the 2010 Lawsuit arose out of a common scheme that was directed at a specific entity (IBG), that involved a single contract (the fee agreement), that arose out of the same single real-estate transaction (the Haymount Project), and that sought a single outcome (precluding IBG's monetary recovery for its involvement in the Haymount Project). Thus, unlike *ACE*, where the "claims" lacked "a sufficient 'nexus' of facts, circumstances, events or causes" (*id.*), the "Claims" at issue here shared a common nexus – namely, an alleged scheme involving the same claimant, the same fee commission, the same contract, and the same real estate transaction. *See Zunenshine v. Executive Risk Indemnity, Inc.*, No. 97-5525, 1998 WL 483475 at *5 (S.D.N.Y Aug. 17, 1998) (cited in *ACE* and holding that a claim fell under the "pending litigation" or "prior notice" exclusion of the insurance policy because the same "fact[s], circumstance[s], situation[s], transaction[s], [and] event[s]" underlay both the current and a prior claim).

Nor is the Court moved by Miller's reliance on *Eureka Federal Savings & Loan Ass'n v. American Casualty Co.*, 873 F.2d 229, 234 (9th Cir. 1989) and *FDIC v. Mmahat*, 907 F.2d 546,

555 (5th Cir. 1990), which, according to Miller, hold that a "common motive" is insufficient to establish interrelatedness between the two actions. *See* ECF No. 23 at 11-13. Like *ACE*, the "common motive" in *Eureka* and *Mmahat* involved discrete acts connected only by the fact that they were undertaken in furtherance of general business practices and desires. For example, in *Eureka*, the alleged "common motive" connecting the two acts arose from the "existence of an aggressive loan policy." *Eureka Fed. Sav. & Loan Ass'n*, 873 F.2d at 235. In reaching its conclusion that the acts were insufficiently related by the aggressive loan policy, the court held that "there were numerous intervening business decisions that took place after the loan policy was initiated that required the exercise of independent judgment." *Id.* Thus, the court refused "to transform disparate acts and omissions" into a single act. *Id.* Similarly, in *Mmahat*, the court determined that "discrete acts of [legal] malpractice result[ing] in discrete losses" were not "logically or causally connected" simply because the legal advice was given for the single purpose of generating legal fees. *Mmahat*, 907 F.2d at 554. Thus, aside from furthering some general business practice or desire, the acts in *Mmahat* and *Eureka* did not share any common fact, circumstance, situation, transaction, or event, as the "Claims" at issue here do.

Furthermore, neither *Eureka* nor *FDIC* involved insurance policies that defined the term "Interrelated Wrongful Acts" (or anything similar). *See MF Nut Co., LLC v. Cont'l Cas. Co.*, No. 11-00004, 2013 WL 164425, at *11 (D. Haw. Jan. 15, 2013) (distinguishing cited cases from the instant case because cited cases "dealt with policies that did not expressly define the term "interrelated wrongful acts'"). Accordingly, based on the expansive definition of "Interrelated Wrongful Acts" in the Policy at issue here, as well as the facts surrounding the 2010 Lawsuit and the 2006 Adversary Proceeding, the Court is persuaded by Continental's argument that the two

proceedings involve a "common scheme" – namely the alleged scheme by HLP, Mr. Miller, and others to deprive IBG of monies arising from or relating to its contract with HBL.

The Court's conclusion is supported by other court's that, unlike *ACE*, *Eureka*, and *Mmahat*, have confronted nearly identical definitions of variations of the term "Interrelated Wrongful Acts." *See e.g.*, *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 704 F. Supp. 2d 537, 543 (E.D. Va. 2010) (the "common ties" in the insured's scheme to defraud constituted "common facts and circumstances" under policy's "interrelated acts or omissions provision"); *Kilcher v. Cont'l Cas. Co.*, 747 F.3d 983 (8th Cir. 2014) (wrongful acts asserted against a financial adviser by different claimants in a series of different claims "share[d] the fact that the wrongful acts were committed by [the same adviser], whose motive was to generate commissions"); *Cont'l Cas. Co. v. Howard Hoffman & Associates*, 955 N.E.2d 151, 167 (holding that an insured's embezzlement scheme is properly viewed as a common circumstance, situation or fact, when considering the ordinary meaning of those terms under policy's "related acts or omissions" provision).

To be certain, the 2010 Lawsuit and the 2006 Adversary Complaint are not without their differences. *See* ECF No. 23 at 10-11. In fact, Miller goes to great lengths to describe the various differences between the two actions. For example, Miller rightly points out that the 2006 Adversary Proceeding and the 2010 Lawsuit arose during different periods of time (*id.* at 10), include different legal claims (*id.* at 10-11), and involve a number of different parties (*id.*). These differences (as well as any other differences) between the two actions, however, are irrelevant to the ultimate question of whether the actions involve "Interrelated Wrongful Acts." As the Policy makes clear, two events are interrelated if they are "logically *or* causally connected by reason or *any* common fact, circumstance, situation, transaction, or event." ECF No. 2-1 at 5 (emphases added). Thus, the relevant focus is not on any number of *differences* between the 2006 Adversary

Proceeding and the 2010 Lawsuit; instead, the relevant focus is on the *similarities* between the two. Indeed, so long as even a single fact, circumstance, situation, transaction, or event logically or causally connects the 2006 Adversary Proceeding and 2010 Lawsuit, then they would be "Interrelated Wrongful Acts." Here, the Court finds that the alleged "common scheme" is enough to conclude that the 2010 Lawsuit and the 2006 Adversary Proceeding share a "common fact, circumstance, situation, transaction, or event." ECF No. 2-1 at 5.

The Court's inquiry, however, does not end here, for it is not enough that the two actions simply share a "common fact, circumstance, situation, transaction, or event." *Id.* In addition, the shared connection – the "common scheme" – must, in some way, logically *or* causally connect the 2006 Adversary Proceeding and the 2010 Lawsuit. There can be no serious doubt that the "common scheme" identified by Continental both logically and causally connects the two actions. It is entirely logical that the Trustee would institute the 2010 Lawsuit against HLP, Mr. Miller, and others to recover damages associated with alleged actions taken by them to avoid paying the judgment issued in the 2006 Adversary Proceeding. *See* ECF No. 12-3 at ¶ 143. Furthermore, had HLP, Mr. Miller and the other defendants satisfied the prior judgment, the Trustee would never have had to initiate the 2010 Lawsuit to recover that money. Thus, but for the alleged actions of HLP, Mr. Miller, and others trying to avoid payment to IBG, the 2010 Lawsuit would never have been filed. Lest there be any doubt about the relatedness of the actions, the very first paragraph of the complaint from the 2010 Lawsuit expressly characterized that action as an "ancillary and adversary proceeding to recover and collect . . . $4,469,158 on a judgment entered against [HLP]" and others in the 2006 Adversary Proceeding. *See* ECF No. 12-3 at ¶ 1. Additionally, paragraph 143 of the complaint from the 2010 Lawsuit states that the allegedly fraudulent transfer was "made with actual intent . . . to hinder, delay or defraud [the

Trustee's] claims arising from defendant HLP's breach of the IBG Fee Agreement [the subject of the 2006 Adversary Proceeding] in that it was the intent of defendant HLP in effecting such payment to Haymount Mezz to transfer assets which would then make them unavailable to satisfy [the Trustee's] claims in the Adversary Proceeding." ECF No. 12-3 at ¶ 143.

Because the 2006 Adversary Proceeding and the 2010 Lawsuit are logically and causally connected by the common scheme to avoid paying monies to IBG for its role in the Haymount Project, the two events are "Interrelated Wrongful Acts" that must be treated as a single "Claim" which is "deemed made on . . . the date on which the earliest such Claim was first made." ECF No. 2-1 at 15. Here, the earlier "Claim" – the 2006 Adversary Proceeding – was made in 2006 when the adversary complaint was served on Mr. Miller and HLP. As such, the 2010 Lawsuit is not covered under the Policy because it constitutes a "Claim" that was made four years prior to the inception of the Policy on November 1, 2010.

## V. CONCLUSION

Based on the forgoing, the Court GRANTS Continental's Motion for Judgment on the Pleadings. The Court will therefore DENY Miller's Motion for Summary Judgment.

Dated: November 7, 2014

/S/
George Jarrod Hazel
United States District Judge